## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## WHEELING

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

v.

                              **CRIM. ACTION NO.: 5:20CR30**
                              **(BAILEY)**

**FILED**

**LASHAWN ROYCE NICKELSON,**

       **Defendant.**

AUG − 4 2021

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

### REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT DEFENDANT'S MOTION [96] TO SUPPRESS AND DEFENDANT'S PRO SE ADDITIONAL MOTION [109] FOR SUPPRESSION BE DENIED

Currently pending before the undersigned is Defendant's Motion [96] to Suppress, filed June 19, 2021. After the completion of briefing, an Oral Argument/Evidentiary Hearing was held on July 15, 2021.[1] At the conclusion of the hearing, the parties requested and were given time to file supplemental briefs. Defendant, by and through his attorney, filed his supplemental brief on July 19, 2021; the Government filed its supplemental brief on July 21, 2021. Defendant filed an additional, *pro se* Motion for Suppression Under Federal Rule of Evidence 201 on July 21, 2021. ECF No. 109. After considering the parties' briefs, the applicable law, and the Court file, and after considering the evidence submitted and the arguments made during the hearing of July 15, 2021, the undersigned would recommend that Defendant's Motion be denied.

---

[1] The Oral Argument/Evidentiary Hearing was originally set for June 28, 2021 but was reset at Defendant's request.

# I.
## FACTUAL/PROCEDURAL HISTORY

Defendant was indicted on October 8, 2020 on the following charges: Conspiracy to Distribute and Possess with the Intent to Distribute Cocaine Base and Heroin; Distribution of Cocaine Base within 1,000 Feet of a Protected Location; Aiding and Abetting the Distribution of Cocaine Base; and Possession with Intent to Distribute Heroin. These charges arise, at least in part, out of evidence seized during a traffic stop which occurred on September 21, 2020 and which is the subject of Defendant's Motion to Suppress. Cpl. Eric McFarland with the West Virginia State Police initiated the traffic stop at issue. Officer Jason Hupp with the Wheeling Police Department and Deputy Randy Holloway with the Marshall County Sheriff's Office assisted with the stop. Each of these officers testified during the July 15, 2021 hearing. Defendant also testified on his own behalf. Their testimony is summarized below.

### A. Cpl. Eric McFarland

Cpl. Eric McFarland is a trooper with the West Virginia State Police. He has been a law enforcement officer for approximately 27 years. As a State Trooper, Cpl. McFarland investigates reported crimes and conducts traffic enforcement. He is also part of the Northern Command Interdiction Team, which means that he goes out and specifically targets drivers transporting drugs on the interstates and streets. He has worked with the Ohio Valley Drug Task Force ("OVDTF") on numerous occasions.

On September 21, 2020, approximately one hour before the traffic stop at issue, Cpl. McFarland met with members of the OVDTF about a suspect and suspect vehicle that were of interest to them. OVDTF asked if Cpl. McFarland would be available to assist with a stop of a vehicle that was coming from out of state into West Virginia and which the OVDTF suspected was transporting narcotics. OVDTF advised that a GPS tracking device was on the vehicle and

2

they had evidence of drug buys with the individual who would be driving the vehicle, Lashawn Nickelson. Cpl. McFarland acknowledged that the tracking device indicated that the vehicle and/or the person operating it were 'high value targets.' Cpl. McFarland also acknowledged that the tracking device had to have been placed after approval of the same by a judicial officer. OVDTF advised that the vehicle in question was a Black Nissan Altima with Florida tags owned by EAN Holdings, which indicated that it was a rental vehicle. Through Cpl. McFarland's experience as a law enforcement officer, he knows that rental vehicles are very commonly used by people trafficking in narcotics and other contraband.

Cpl. McFarland first saw the suspect vehicle traveling on I-470 at approximately 10:00PM. It was dark out. Cpl. McFarland was dressed in his uniform and was traveling in a marked West Virginia State Police cruiser. Officer Hupp assisted Cpl. McFarland with the stop. Officer Hupp is a K9 officer. Officer Hupp was also in a uniform and in a marked cruiser. OVDTF officers were traveling behind the suspect vehicle, advising of its location. The suspect vehicle made an abrupt lane change without signaling and exited I-470 at Exit 1. Cpl. McFarland followed the vehicle and conducted a traffic stop (for failure to signal a lane change in violation of W.Va. Code § 17C-8-8(b)) on WV Route 2.

Cpl. McFarland initiated contact with the vehicle from the passenger side. Two persons were in the vehicle: the driver, LaShawn Nickelson and the passenger, Anthony Turner. Officer Hupp arrived at the traffic stop within minutes of Cpl. McFarland. Officer Hupp initiated contact with the vehicle from the driver's side. Defendant and Mr. Turner appeared to be nervous. They were breathing rapidly, and their hands were shaking. Mr. Turner was wearing sunglasses. Cpl. McFarland asked for Defendant's driver's license, vehicle, and insurance information, which he provided. Cpl. McFarland then asked Defendant to return to Cpl. McFarland's police vehicle while

3

he ran his license information, which Defendant did. Cpl. McFarland also ran a criminal history search on Defendant and Mr. Turner. Cpl. McFarland wrote a warning citation for not utilizing a turn signal to change lanes. Officer Hupp stayed with Mr. Turner and the vehicle during this time.

After Cpl. McFarland finished preparing the warning, he asked for permission to search the vehicle. Defendant declined. Cpl. McFarland then asked Officer Hupp to deploy the K9. The K9 conducted an exterior sniff of the vehicle and indicated a positive hit. At that point, Cpl. McFarland felt he had probable cause to search the vehicle, which he did. He did not find anything on the first search. Officers re-deployed the K9 inside of the vehicle. Officer Hupp also searched the vehicle. Officer Hupp indicated marijuana residue on the driver's side floorboard. The K9 gave a positive indication at the driver's side floorboard of the vehicle. Deputy Holloway from the Marshall County Sheriff's Office arrived on scene and began assisting with the stop.[2]

Apparently believing that the positive indication for narcotics in the area of the driver's side floorboard was the result of Defendant having narcotics in his shoes, officers asked Defendant remove his shoes. Defendant refused. During this time, Mr. Turner was patted down and marijuana, heroin, and ecstasy were found on him. Mr. Turner was then handcuffed. Defendant then attempted to flee but was tasered and handcuffed. After he was handcuffed, Defendant was searched. His shoes were removed, and officers found a substance that was field tested and returned positive for heroin.

On cross examination, Cpl. McFarland acknowledged that his contact with the OVDTF, the information obtained therefrom, and the purpose of the traffic stop (assisting OVDTF in stopping Defendant's vehicle) do not appear in his police report. He confirmed that he intentionally left these facts out of his police report because he did not believe they were relevant

---

[2] He was not called to the scene but was in the area of the traffic stop and decided to assist.

to his stop.  He acknowledged that it was his intention to stop Defendant's vehicle.  Once Defendant changed lanes without signaling, Cpl. McFarland had reason to do so.  After he gave Defendant the warning citation, the traffic stop was over.  Cpl. McFarland requested that the K9 conduct an exterior sniff based upon Defendant's demeanor (nervous, even after he received a warning citation rather than a ticket) and based upon the information from the OVDTF that Defendant was the subject of an open drug investigation.  He denied that the K9 sniff unreasonably extended the traffic stop.  Cpl. McFarland asks drivers to step out of their vehicle in 99% of the traffic stops which he conducts because he likes to observe the drivers.  Most of the stops he conducts are for interdiction purposes.

**B.  Jason Hupp, Wheeling Police Department K9 Unit**

Officer Jason Hupp is a K9 officer with the Wheeling Police Department.  He has been a law enforcement officer for approximately eight and one-half years.

On September 21, 2020, approximately one hour before the traffic stop was initiated, Officer Hupp met with OVDTF officers at their office and was advised that LaShawn Nickelson was driving a Black Nissan Altima with a Florida registration into West Virginia, and that this vehicle possibly contained a supply of narcotics.  OVDTF requested Officer Hupp's assistance in intercepting Defendant and the vehicle.  Officer Hupp was working with Cpl. McFarland on this task.  Officer Hupp proceeded to I-70 to await the vehicle.

Officer Hupp did not initiate the traffic stop – Cpl. McFarland did.  He came upon the scene of the stop (on the Route 2 collector) several minutes after it commenced.  When he arrived, Cpl. McFarland was standing at the passenger side of the subject vehicle.  Upon approach, Officer Hupp identified the driver as LaShawn Nickelson and the passenger as Anthony Turner.  No other individuals were in the vehicle.  The traffic stop occurred at approximately 10:00PM.  Mr. Turner

was wearing sunglasses at the time of the stop. Mr. Turner did not make eye contact with officers but continued looking straight ahead. Defendant appeared to be breathing heavily.

Cpl. McFarland asked Defendant to step out of the vehicle. They went to Cpl. McFarland's cruiser. Officer Hupp remained with Mr. Turner. After a short time, Cpl. McFarland asked Officer Hupp to conduct a K9 sniff of the vehicle. Officer Hupp asked Mr. Turner to get out of the vehicle, which he did, and then the K9 sniff commenced. The K9 gave a positive indication on the vehicle and Cpl. McFarland searched the vehicle while Officer Hupp stood with Defendant and Mr. Turner twenty to thirty feet away. Cpl. McFarland did not find anything on his initial search and asked Officer Hupp to redeploy the K9, this time inside the vehicle. The K9 gave a positive indication in the vicinity of the driver's side floorboard. A small amount of marijuana shake was located in that area. Nothing else was located. Based on his training and experience, Officer Hupp believed that the odor had been transferred from Defendant and Mr. Turner to the location in the vehicle where the dog gave a positive indication. He believed the substance would be found on Defendant, specifically in the area of his feet.

Officer Randy Holloway of the Marshall County Sheriff's Department arrived on scene during this time. Officer Hupp searched Mr. Turner. He felt a bulge in Mr. Turner's sock above his shoe. Mr. Turner indicated that it was heroin. Officer Hupp retrieved the bag of suspected heroin from Mr. Turner. Marijuana was located in his left sock. Ecstasy pills were located in his shirt pocket. Mr. Turner was arrested and taken to Officer Hupp's cruiser. At this time, he saw Defendant try to run away. Deputy Holloway and Cpl. McFarland chased Defendant and apprehended him. Cpl. McFarland removed Defendant's shoes. Suspected heroin was located inside of the shoes.

On cross examination, Officer Hupp acknowledged that his police report indicates that he happened upon the traffic stop initiated by Cpl. McFarland. It does not mention the fact that OVDTF contacted him prior to the stop to advise of Defendant's vehicle, and it does not mention his plan with Cpl. McFarland to stop the suspect vehicle. He does not know why he left this information out of his police report.

## C. Deputy Randy Holloway, Marshall County Sheriff's Department

Randy Holloway is a deputy with the Marshall County Sheriff's Office. He has been in law enforcement for a little over four years. On September 21, 2020, he was in the area of the Route 2 collector in Ohio County at approximately 10:30pm or 11:00pm. He saw Cpl. McFarland and Officer Hupp at the traffic stop. Because they do not usually conduct traffic stops that he knows of, he pulled over to see if they needed him to assist. He did not know anything about the traffic stop at that time.

When Deputy Holloway arrived at the stop, Cpl. McFarland was searching the suspect vehicle. Officer Hupp asked if Deputy Holloway would search Defendant, which he did. He began with a normal pat down, starting at Defendant's shoulders. He got down to Defendant's feet and asked if Defendant would take his shoes off. Defendant made some comments, took off a lanyard that was around his neck (it had keys on it), threw it at Deputy Holloway (hitting him in the chest) and took off running. He ran across three lanes of traffic and stopped when he reached a concrete wall approximately twenty feet high. Deputy Holloway deployed his taser, but the probes hit Defendant in the jacket, which he removed, so they had no effect. Cpl. McFarland assisted Deputy Holloway with placing Defendant under arrest. One of the task force police vehicles pulled up to the scene at some point thereafter. Deputy Holloway

did not search Defendant's shoes, but he knows heroin was obtained from Defendant's shoes.  He believes it was heroin mixed with fentanyl.

### D. LaShawn Royce Nickelson

On September 21, 2020, Defendant was the subject of a traffic stop at WV Route 2 and I-470.  Cpl. McFarland initiated his lights and Defendant stopped immediately.  Cpl. McFarland approached Defendant's vehicle and told Defendant that he was stopped for failure to use a turn signal.  Cpl. McFarland asked Defendant to step out of the vehicle and go with Cpl. McFarland to his cruiser so that Cpl. McFarland could issue a warning citation.  On his way to the cruiser, Cpl. McFarland searched Defendant, including reaching into Defendant's pockets.  After the search, he was permitted into Cpl. McFarland's cruiser where Cpl. McFarland issued the warning citation. According to the warning citation, the same was issued at 10:10pm.[3]

After he was issued the warning citation, he thought he was free to go, but Cpl. McFarland told him that he was not free to leave.  Cpl. McFarland ran a background check on Defendant and then asked if he could search Defendant's vehicle.  Defendant denied permission.  Cpl. McFarland and Defendant traveled back to Defendant's vehicle where Cpl. McFarland asked Officer Hupp to deploy the K9.  The K9 made two laps around the vehicle and sniffed inside the vehicle as well. Defendant twice asked if he was free to leave, but was told no.  He asked the first time after the warning citation was issued.  The second time he asked was after the dog finished his first run. Officers told Defendant no and deployed the dog a second time.  He was then told he could leave, but when contraband was found in Mr. Turner's shoes, Deputy Holloway was told to search Defendant again.  Deputy Holloway asked Defendant to take his shoes off.  Defendant refused.

---

[3] Defendant introduced a copy of the warning citation during the hearing.  It was made a part of the file at ECF No. 106-1.

On cross examination, Defendant admitted that from the time Cpl. McFarland pulled him over to the conclusion of the traffic stop, he had heroin in his shoes. He was not aware that a tracker had previously been placed on his vehicle, or that officers knew he was traveling back from the Detroit, MI area at the time of the traffic stop. Nevertheless, Defendant maintains that he used his turn signal when he made the lane change. He further testified that Officer Hupp did not appear on scene until after Cpl. McFarland gave Defendant the warning citation at approximately 10:10pm.

## II.
## ARGUMENTS OF THE PARTIES

### A. Defendant's Arguments

Defendant contends that the initial stop was invalid. Defendant further argues that the stop was unreasonably and illegally extended by Cpl. McFarland.

### B. Government's Arguments

The Government argues that the stop was a valid traffic stop for failure to signal a lane change. The Government further argues that the stop was not unreasonably or illegally extended because officers had reasonable suspicion to extend the stop beyond the time necessary to write the warning citation.

## III.
## APPLICABLE LAW

The burden of proof for a Motion to Suppress is on the party seeking to suppress the evidence. *United States v. Gualtero*, 62 F.Supp.3d 479, 482 (E.D. Va. 2014) ("[t]he legal standards governing a motion to suppress are clear....[t]he burden of proof is on the party who seeks to suppress the

evidence") (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)).  Once the defendant establishes a basis for his Motion, the burden shifts to the Government to prove by a preponderance of the evidence that the challenged evidence is admissible.  *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence").

With these standards in mind, the undersigned will turn to the substance of the arguments raised vis-à-vis Defendant's Motion to Suppress.

# IV.
# DISCUSSION

### A. Initial Stop

In arguing that the initial stop was invalid, Defendant first contends that officers' accounts of the events before the traffic stop, including their meeting and coordinating with each other and the OVDTF, are not true.[4]  Defendant takes issue with the fact that the details surrounding officers' interaction with OVDTF before the traffic stop and the information that obtained as a result are not included within officers' police reports or in any part of the discovery received from the Government.  Defendant also questions whether a traffic violation actually occurred.  After considering these arguments in conjunction with officer's testimony and the other evidence submitted, the undersigned does not agree with Defendant's characterization of officers' testimony.

First, the summaries of the officers' police reports as offered during the hearing do not appear to obviously contravene the officers' testimony.  Rather, it appears that officers' testimony

---

[4] "None of these facts were contained in any of the discovery provided by the United States Government.  Therefore, the Defendant contends that they are not true."  ECF No. 108 at p. 7.

provided an additional level of detail regarding events which preceded the actual traffic stop. Simply because officers' testimony was apparently more detailed than the narratives of their police reports is not sufficient grounds upon which to conclude that officers' testimony is suspicious or untrue.[5]  Additionally, the officers testified in Court under oath.  Offering testimony under oath provides an additional layer of assurance that officers' testimony is truthful.[6]

Finally, the undersigned would note that, if Cpl. McFarland's and Officer Hupp's testimony was untrue as Defendant suggests, a high level of cooperation and coordination had to have occurred by and between Cpl. McFarland and Officer Hupp with respect to their testimony. The end goal of such cooperation and coordination would have been officers' providing knowingly perjured testimony to the Court.  Indeed, although not explicitly stated, Defendant's argument nevertheless asks the Court to conclude that both Cpl. McFarland and Officer Hupp knowingly perjured themselves before the Court.  Given the facts of the case and the reasonableness of the explanation for the lack of detail within their respective police reports, and given the dearth of evidence that would or could demonstrate a history of dishonesty from either Cpl. McFarland or Officer Hupp, the undersigned cannot justify such a conclusion.

Taking Cpl. McFarland's, Officer Hupp's, and Deputy Holloway's[7] recounting of these events as true, then, the following can serve as a summary of the relevant events...Sometime in the evening hours of September 21, 2020, Cpl. McFarland and Officer Hupp were contacted by and met with OVDTF regarding OVDTF's request for assistance in stopping the vehicle operated

---

[5] Defendant filed a copy of the "Report of Criminal Investigation" at ECF No. 110 on July 21, 2021.  A review of the same reinforces the aforementioned conclusion.

[6] The undersigned does not mean to suggest that testifying under oath automatically means the testimony given is truthful.  Rather, where, as here, testimony is provided under oath and there is nothing in the record which would demonstrate that the witnesses, i.e. the officers, have a history of being untruthful, it is reasonable to rely on the testimony offered as true.

[7] Defendant's credibility arguments do not seem to extend to Deputy Holloway.

11

by Defendant, a black Nissan Altima with Florida registration. OVDTF advised that Defendant had participated in drug transactions with persons affiliated with OVDTF, and a tracker that had been approved by a judicial officer was on Defendant's vehicle. On the night of the stop, OVDTF advised Cpl. McFarland and Officer Hupp that Defendant's vehicle had been to Detroit, MI, a place for known drug supply, and was going to be traveling to or through West Virginia. OVDTF believed that Defendant's vehicle contained narcotics.

With the aforementioned information, Cpl. McFarland and Officer Hupp began patrolling I-470 and I-70, respectively. Cpl. McFarland saw Defendant's vehicle enter West Virginia on I-470 and positioned his cruiser behind Defendant's vehicle. Defendant made an abrupt lane change without signaling, disrupting traffic patterns. As a result, Cpl. McFarland initiated a traffic stop.

The stop took place on the West Virginia State Route 2 collector, just off of I-470. Cpl. McFarland made contact with the suspect vehicle on the passenger side. He asked Defendant to go to his cruiser while he prepared a warning citation for failure to signal a lane change. Before entering the cruiser, Cpl. McFarland searched Defendant. Once inside the cruiser, Cpl. McFarland ran a driver's license and registration check and checked to see whether there were any outstanding warrants for Defendant. The check came back clean. Cpl. McFarland completed the warning citation, and they exited the cruiser.

Cpl. McFarland asked to search Defendant's vehicle. Defendant denied permission to search. Cpl. McFarland asked Officer Hupp (who by this time had arrived on scene) to deploy his K9 around the exterior of the vehicle. The K9 jumped inside the vehicle and made a positive indication. Cpl. McFarland searched the vehicle while Officer Hupp, Defendant, and Mr. Turner (who was now outside of the vehicle) stood a distance away. Cpl. McFarland did not find anything

and asked Officer Hupp to deploy the K9 again.  Officer Hupp did so.  Officer Hupp found
marijuana shake on the floorboard of the driver's side.  The K9 again gave a positive indication,
this time in the specific vicinity of the driver's side floorboard.  A second search did not reveal
any contraband in the vehicle. Officer Hupp searched Mr. Turner.  Narcotics were located on Mr.
Turner's person.[8]  Deputy Holloway, who by this point had stopped to assist, began a search of
Defendant's person at Cpl. McFarland's request.  Deputy Holloway asked Defendant to remove
his shoes, but Defendant refused.   At some point, Defendant tried to abscond.   He was
apprehended. Defendant was searched. His shoes were removed. Heroin was located therein.

        The Fourth Amendment guards against unreasonable searches and seizures.  *See* U.S.
Const. amend. IV.  Temporary detention of individuals during the stop of an automobile by the
police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons
within the meaning of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10
(1996).   "An automobile stop is thus subject to the constitutional imperative that it not be
unreasonable under the circumstances. *Id.* at 810 (internal quotations omitted).

        Courts assess the constitutionality of a traffic stop under the two-prong standard articulated
in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Palmer*, 820 F.3d 640, 648 (2016).  First,
courts consider whether the articulated bases for the stop were legitimate.  *Id.*   Second, courts
examine whether the actions of the authorities during the stop were reasonably related in scope to
the bases for the seizure.  *Id.* at 649.  In general, the decision to stop an automobile is reasonable
where police have probable cause to believe that a traffic violation has occurred.  *Id.* ("*Terry*'s first
prong is satisfied whenever it is lawful for police to detain an automobile and its occupants pending

---

[8] Marijuana was located on Mr. Turner's person following a search.  Given this, to the extent Defendant suggests that officers' claims that marijuana shake was found on the driver's side floorboard is 'suspicious,' the undersigned would not agree.

inquiry into a vehicular violation") (internal quotations omitted) (citing *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). "Without question, such a violation may include failure to comply with traffic laws." *Id.*

Here, Cpl. McFarland testified that Defendant's vehicle made an abrupt lane change on I-470 to the exit ramp without using his turn signal. According to Cpl. McFarland, failure to signal a lane change is a violation of W. Va. Code § 17C-8-8(b). Because Cpl. McFarland stopped Defendant's vehicle to investigate a traffic violation, i.e., the failure to signal a lane change, the initial stop of Defendant's vehicle was legitimate. In so finding, the undersigned acknowledges Defendant's testimony that he used his turn signal when he changed lanes. This testimony appears to be offered to support the argument that officers' testimony is untrue. For the reasons set forth above, the undersigned is not inclined to conclude that Cpl. McFarland's testimony regarding Defendant's failure to signal is not truthful.

To the extent Defendant argues that Cpl. McFarland only executed the traffic stop to search the vehicle for narcotics (rather than truly investigate the traffic violation), such an argument does not discredit the validity of the initial stop.[9] As long as a stop is objectively reasonable under the Fourth Amendment, a police officer's subjective intent or motivation is not relevant to the reasonableness of a traffic stop. *Whren v. United States*, 517 U.S. at 813. Indeed, "a traffic-violation arrest [will] not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search.'" *Id.* at 812-813 (quoting *United States v. Robinson*, 414 U.S. 218, 221, n.1 (1973)). As explained above, the traffic stop here was objectively reasonable in light of Defendant's failure to

---

[9] Leaving aside Defendant's argument regarding the truth of Cpl. McFarland's assertion that Defendant failed to signal when he changed lanes, Defendant's argument can be interpreted as one which questions the true intention of Cpl. McFarland in executing the stop.

14

use his turn signal to make a lane change. Therefore, Cpl. McFarland's subjective intent in stopping Defendant's vehicle on the night in question is of no moment.

Even if a traffic violation did not occur, as Defendant contends,[10] Cpl. McFarland nevertheless had reasonable suspicion to stop Defendant's vehicle based upon the information known to Cpl. McFarland at the time of the traffic stop. "[T]he Fourth Amendment requires that a brief investigatory stop of an individual be supported by reasonable suspicion." *United States v. Foreman*, 369 F.3d 776, 781 (2004). "The *Terry* reasonable suspicion standard requires an officer to have a reasonable suspicion that criminal activity is afoot." *Id.* "The standard of reasonable suspicion…entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996) (internal quotations omitted). "The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed." *Foreman*, 369 F.3d at 781. "[F]actors consistent with innocent travel can, *when taken together*, give rise to reasonable suspicion." *Id.* (emphasis in original) (citing *United States v. Sokolow*, 490 U.S. 1, 9 (1989)). "The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Foreman*, 369 F.3d at 781.

Here, Cpl. McFarland possessed reasonable suspicion of criminal activity when he stopped Defendant's vehicle because, when he stopped Defendant's vehicle, Cpl. McFarland knew that Defendant was the subject of an active drug investigation. Additionally, Cpl. McFarland knew that Defendant had been involved in more than one drug transaction; he was traveling from Detroit,

---

[10] Defendant testified that he did <u>not</u> fail to signal a lane change.

15

MI, a known source location for narcotics; he was traveling in a rental vehicle; rental vehicles are known to be used for drug trafficking activities; and a tracking device had been placed on Defendant's vehicle with authority from a judicial officer. Although innocent travelers may travel from Detroit, MI into West Virginia in a rental vehicle, these facts when taken in conjunction with the facts of the active drug investigation serve to eliminate a substantial portion of those innocent travelers.

Defendant argues that the GPS tracker alone is not enough to support reasonable suspicion to stop the vehicle. Defendant contends that more is needed, i.e. an allegation that Defendant's vehicle was seen leaving the location of a drug supplier, for example. Defendant's argument seems to suggest that more of a connection between Defendant's actions and alleged drug trafficking activities is necessary other than simply having a GPS tracker on his rental vehicle while traveling from Detroit, MI. This argument ignores the fact that Cpl. McFarland and OVDTF were aware that Defendant had completed drug transactions with OVDTF personnel prior to the stop at issue. The information regarding the completed drug transactions removes Defendant from the pool of innocent travelers and places him squarely in the pool of travelers likely to be engaging in drug trafficking activities. Therefore, Cpl. McFarland's stop of Defendant's vehicle was reasonable.

## B. Extension of Traffic Stop

Defendant next argues that officers unreasonably extended the traffic stop at issue, thus violating Defendant's Fourth Amendment Rights and necessitating the suppression of evidence discovered. In support of this argument, Defendant relies primarily upon *Rodriguez v. United States*, 575 U.S. 348 (2015). In *Rodriguez*, the driver was stopped by police for driving on the shoulder of a highway. After attending to the traffic violation, which ended with officers issuing a warning citation, officers sought permission to walk a K9 unit around the subject vehicle.

16

Permission was declined. Officers extended the stop anyway by detaining Mr. Rodriguez until a K9 unit arrived, and then walking the K9 unit around the vehicle. The Supreme Court found that officers may not extend an otherwise completed traffic stop absent reasonable suspicion to conduct a drug dog sniff. *Id.*[11] Defendant asserts that officers similarly erred in the instant case. The undersigned does not agree.

*Rodriguez* did not involve a suspect who was under active investigation for drug trafficking. Further, no GPS tracker had been placed on Mr. Rodriguez's vehicle, and officers did not have knowledge of prior drug transactions involving Mr. Rodriguez and police personnel. In short, officers in *Rodriguez* happened upon his vehicle when he drove on the shoulder and had no prior knowledge concerning Mr. Rodriguez or his vehicle prior to the traffic stop. Once the traffic stop was completed, and seemingly without independent justification,[12] officers detained Mr. Rodriguez for a drug dog sniff. That is not so in the present case. As detailed above, at the time of the traffic stop at issue, Cpl. McFarland knew that Defendant was the subject of an active drug trafficking investigation; that he had a GPS tracker on his vehicle (which could only have been placed with authority from a judicial officer); he had completed drug transactions with OVDTF personnel; he was traveling from Detroit, MI, a known source location for narcotics; and he was traveling in a rental vehicle, which is typically used in drug trafficking activities. Given these factors, the instant case is not analogous to *Rodriguez* because Cpl. McFarland possessed reasonable suspicion that Defendant was involved in criminal activity when Cpl. McFarland stopped Defendant's vehicle. Reasonable suspicion permitted Cpl. McFarland to extend the stop

---

[11] "A seizure justified only by a police-observed traffic violation...becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation. *Rodriguez v. United States*, 575 U.S. 348, 350-51 (internal quotations and citations omitted).

[12] The Magistrate Judge and the District Court found that the dog sniff was not independently supported by reasonable suspicion. *Id.* at 357-58. The Court of Appeals did not review this finding, however. Therefore, it was not considered by the Supreme Court. *Id.*

17

beyond those activities necessary to investigate Defendant's failure to signal a lane change.  *See United States v. Villavicencio*, 825 Fed.Appx. 88, 101 (2020) ("because [Officer] Wiessman had reasonable suspicion of criminal activity, her extension of the stop did not violate the narrow rule found in *Rodriguez*").  The stop was therefore not, unreasonably, extended.

## V.
## CONCLUSION

Therefore, the undersigned would conclude that Defendant has not met his burden of proving that the evidence in question should be suppressed.  The Government has established by a preponderance of the evidence that the evidence in question is admissible.  Accordingly, and for all of the foregoing reasons, the undersigned would **RECOMMEND** that Defendant's Motion [96] to Suppress and Pro Se Additional Motion [109] for Suppression be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within **fourteen (14) days** after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to parties who appear pro se and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated:    8 - 4 - 21

JAMES P. MAZZONE
UNITED STATES MAGISTRATE JUDGE

19